**2014 - 1254**

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

EIDOS DISPLAY, LLC, EIDOS III, LLC,

*Plaintiffs-Appellants*,

v.

AU OPTRONICS CORPORATION, AU OPTRONICS CORPORATION AMERICA, CHI MEI INNOLUX CORPORATION, CHI MEI OPTOELECTRONICS USA INC., CHUNGHWA PICTURE TUBES, LTD., HANNSTAR DISPLAY CORPORATION, HANNSPREE NORTH AMERICA, INC.,

*Defendants-Appellees*.

**Appeal from the United States District Court for the Eastern District of Texas in No. 6:11-cv-201-LED-JDL, Judge Leonard Davis**

## PETITION FOR REHEARING EN BANC OF DEFENDANTS-APPELLEES CHI MEI INNOLUX CORPORATION, CHI MEI OPTOELECTRONICS USA INC., CHUNGHWA PICTURE TUBES, LTD., HANNSTAR DISPLAY CORPORATION, HANNSPREE NORTH AMERICA, INC.

E. ROBERT YOCHES
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 NEW YORK AVENUE, NW
WASHINGTON, DC 20001
(202) 408-4000

MING-TAO YANG
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
3300 HILLVIEW AVENUE
PALO ALTO, CA 94304
(650) 840-6600

*Attorneys for Defendants-Appellees Chi Mei Innolux Corporation, Chi Mei Optoelectronics USA Inc., HannStar Display Corporation, and Hannspree North America, Inc.*

CHRISTOPHER R. BENSON
2705 PEARCE ROAD
AUSTIN, TX 78730
(832) 567-0700

DANIEL LEVENTHAL
ERIC HALL
NORTON ROSE FULBRIGHT US LLP
1301 MCKINNEY, SUITE 5100
HOUSTON, TX 77010
(713) 651-5151

*Attorneys for Defendant-Appellee Chunghwa Picture Tubes, Ltd.*

April 9, 2015

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees Chi Mei Innolux Corporation and Chi Mei Optoelectronics USA Inc. certify the following:

The full name of every party or amicus represented by us is:

> Chi Mei Innolux Corporation (now named Innolux Corporation)
> Chi Mei Optoelectronics USA, Inc.

The names of the real parties in interest represented by us are:

> Innolux Corporation
> Chi Mei Optoelectronics USA, Inc.

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

> Chi Mei Optoelectronics Japan Co., Ltd.

The names of all law firms and the partners or associates that appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this Court are:

> Donald R. McPhail
> Barry P. Golob
> Kerry McTigue
> COZEN O'CONNOR
>
> Andy Tindel
> MT2 LAW GROUP
>
> Ming-Tao Yang
> E. Robert Yoches
> Jacob A. Schroeder[1]
> FINNEGAN, HENDERSON, FARABOW,
>   GARRETT & DUNNER, LLP

---

[1] Mr. Schroeder left Finnegan April 4, 2015.

Debra Elaine Gunter
Herbert A. Yarbrough, III
YARBROUGH WILCOX GUNTER, PLLC

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees HannStar Display Corporation and Hannspree North America, Inc. certify the following:

The full name of every party or amicus represented by us is:

> HannStar Display Corporation;
> Hannspree North America, Inc.

The names of the real parties in interest represented by us are:

> HannStar Display Corporation;
> Hannspree North America, Inc.

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

> N/A

The names of all law firms and the partners or associates that appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this Court are:

> Ming-Tao Yang
> E. Robert Yoches
> Jacob A. Schroeder[1]
> FINNEGAN, HENDERSON, FARABOW,
>   GARRETT & DUNNER, LLP
>
> Debra Elaine Gunter
> Herbert A. Yarbrough, III
> YARBROUGH WILCOX GUNTER, PLLC
>
> John R. Alison
> David J. Martens
> WINSTON & STRAWN LLP

---

[1] Mr. Schroeder left Finnegan April 4, 2015.

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee Chunghwa Picture Tubes, Ltd. certify the following:

The full name of every party or amicus represented by us is:

Chunghwa Picture Tubes, Ltd.

The name of the real party in interest represented by us is:

N/A

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

N/A

The names of all law firms and the partners or associates that appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this Court are:

Christopher R. Benson

Fulbright & Jaworski LLP / Norton Rose Fulbright US LLP
(Eric Hall, Daniel Leventhal, Paul Dyson, Anuj Dharia)

# TABLE OF CONTENTS

TABLE OF CONTENTS.........................................................................................i

TABLE OF AUTHORITIES .............................................................................. ii

TABLE OF ABBREVIATIONS .......................................................................... iii

I.    STATEMENT OF COUNSEL ........................................................................1

II.   POINTS OF LAW OR FACT THE PANEL OVERLOOKED OR
      MISAPPREHENDED ...................................................................................1

III.  STATEMENT OF THE CASE ......................................................................3

      A.    Factual Background...............................................................................3

      B.    The Panel's Opinion..............................................................................6

IV.   ARGUMENT FOR REHEARING EN BANC ...............................................9

      A.    In Affording No Deference to the District Court, the Panel,
            Found Facts De Novo, in Contravention of *Teva* ..................................9

      B.    The Panel's Decision Will Cause Significant Harm...........................12

V.    CONCLUSION...........................................................................................13

# TABLE OF AUTHORITIES

## CASES

*L.B. Plastics, Inc. v. Amerimax Home Products, Inc.*,
499 F.3d 1303 (Fed. Cir. 2007) ............................................................2

*Miller* v. *Fenton*,
474 U. S. 104 (1985)............................................................................9

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014)......................................................................3, 6

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .........................................................1, 2

*Teva Pharms. USA, Inc. v. Sandoz Inc.*,
810 F. Supp. 2d 578 (S.D.N.Y. 2011) .................................................3

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015)................................................................. passim

## RULES

Fed. R. Civ. P. 52 .................................................................................12

## OTHER AUTHORITIES

Jason Rantanen, *Teva, Nautilus, and Change Without Change* (March 26,
2015), *available at*
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2585844.......................7, 12

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| "Eidos" | Plaintiffs-Appellants Eidos Display, LLC and Eidos III, LLC |
| "Defendants" | Defendants-Appellees AU Optronics Corporation, AU Optronics Corporation America, Chi Mei Innolux Corporation, Chi Mei Optoelectronics USA Inc., Chunghwa Picture Tubes, Ltd., HannStar Display Corporation, and Hannspree North America, Inc. |
| "the '958 Patent" | U.S. Patent No. 5,879,958 |
| "BB" | Eidos's opening brief on appeal, dated May 8, 2014 |
| "RB" | Defendants' brief on appeal, dated July 14, 2014 |
| "Panel Op." | The Panel's decision in this appeal, dated March 10, 2015 |

## I.    STATEMENT OF COUNSEL

Based on my professional judgment, I believe the panel decision is contrary to the Supreme Court case, *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015), and the *en banc* decision of this Court, *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

Based on my professional judgment, I believe this appeal requires an answer to the following precedent-setting question of exceptional importance: Whether this Court may dismiss a district court's findings of fact as "immaterial" and avoid reviewing them under the "clearly erroneous" standard by adopting its own determination of how a skilled artisan would interpret a term, even when the intrinsic evidence has ambiguities.

*/s/ E. Robert Yoches*
E. Robert  Yoches
*Attorney of Record for Chi Mei Innolux*
*Corporation, Chi Mei Optoelectronics*
*USA Inc., HannStar Display Corporation,*
*and Hannspree North America, Inc.*

*/s/ Christopher R. Benson*
Christopher R. Benson
*Attorney of Record for Chunghwa Picture*
*Tubes, Ltd.*

## II.    POINTS OF LAW OR FACT THE PANEL OVERLOOKED OR MISAPPREHENDED

This case hinges on the meaning of the third "contact hole" in step G8 of claim 1: "a contact hole for source wiring and gate wiring connection terminals."

RB2-3. In trying to determine whether the third "contact hole" means one common hole or two separate holes, the district court found the claim language and specification ambiguous and inconclusive, and received opinions from experts for both parties, many explaining how a person of ordinary skill would understand the term in view of the specification. RB20-21;A32-33. The experts offered different opinions of what the term meant. Defendants' experts also opined a skilled artisan could not reconcile the disclosure with the disputed term. RB17-18. Eidos's experts disagreed. RB18. The district court rejected the opinions of Eidos's experts, and held that a skilled artisan would view the claim as "insolubly ambiguous" (A33-34), so it found the claim indefinite. RB20-21.

According to *Phillips*, "the words of a claim 'are generally given their ordinary and customary meaning' . . . [which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." 415 F.3d at 1312-13 (citations omitted). Determining that meaning in this case required expert opinions because the claim language is ambiguous, and the specification does not disclose a single embodiment that supports either party's interpretation of the entire claim. *See L.B. Plastics, Inc. v. Amerimax Home Products, Inc.*, 499 F.3d 1303, 1308 (Fed. Cir. 2007) ("Since the intrinsic record provides no further guidance to the meaning of the terms [in dispute], the district court properly turned to extrinsic evidence . . . ."); RB18-20. Even the

Reexamination Examiner had difficulty interpreting the claim, only choosing a construction because he lacked the authority to reject a claim as indefinite during reexamination. RB10-11.

*Teva* requires this Court to review the district court's findings of subsidiary facts for "clear error." 135 S. Ct. at 840-41. The district court's findings in this case are precisely the "factual findings subsidiary to the ultimate issue of definiteness" the Supreme Court acknowledged in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 n.10 (2014).

In *Teva*, the district court resolved conflicts in the extrinsic evidence in denying Mylan's motion for summary judgment of indefiniteness. *Teva Pharms. USA, Inc. v. Sandoz Inc.*, 810 F. Supp. 2d 578, 590-96 (S.D.N.Y. 2011). The Panel in *Teva* substituted its own fact findings for the district court's, but without finding the district court's findings clearly erroneous. *Teva*, 135 S. Ct. at 843. The Panel in this case has committed the same error. This contravention of *Teva* requires the Court to vacate the Panel's decision.

## III.    STATEMENT OF THE CASE

### A.    Factual Background

The '958 Patent relates to a method for fabricating an LCD panel. RB2. Claim 1, with the term-in-issue highlighted, recites:

> 1. A method for producing an electro-optical device. . . , wherein the method comprises:

a step G1 of forming a first metal film on the surface of said one substrate,

a first photolithographic step G2 of patterning the first metal film to form a gate electrode and a gate wiring,

a step G3 of forming a first insulator film, a semiconductor film and an ohmic contact film . . . ,

a second photolithographic step G4 of patterning the semiconductor active film and the ohmic contact film . . . ,

a step G5 of forming a second metal film on the surface of said one substrate . . . ,

a third photolithographic step G6 of patterning the second metal film and the ohmic contact film . . . ,

a step G7 of forming a passivation film on the surface of said one substrate . . . , and

a fourth photolithographic step G8 of patterning the passivation film to form *a contact hole reaching the gate wiring, a contact hole reaching the drain electrode and a contact hole for source wiring and gate wiring connection terminals*,

a step G9 of forming a transparent conductive film on the surface of said one substrate . . . , and

a fifth photolithographic step G10 of patterning the transparent conductive film . . . .

BB7-8 (emphasis added).

During claim construction, the parties disputed the meaning of the G8 step.

RB12. The claim language repeats the same grammatical structure for each contact hole:

Because of this, Defendants contended the G8 step required forming only three contact holes. RB13-14. Eidos contended one of skill in the art would understand the third contact hole to mean two holes. RB13-14. The district court could not reconcile either construction with the intrinsic record, and accepted extrinsic evidence. RB15,20. Defendants' experts explained that a skilled artisan would find no support in the specification for rewriting the third contact hole as two separate holes. RB17-18. Eidos's expert disagreed. RB18-20.

The district court found the disputed term ambiguous after considering the expert declarations. A25;A33 ("Overall, the expert reports merely highlight the ambiguity in the term at issue."). The court also found the claims failed to inform a skilled artisan of the scope of the invention with a reasonable degree of precision and particularity. A27;A34. Although its decision issued before *Nautilus*, the district court used a similar standard. *Compare* A27 ("The definiteness standard is one of reasonableness under the circumstances, requiring that, in light of the

teachings of the prior art and the invention at issue, the claims apprise those skilled in the art of the scope of the invention with a reasonable degree of precision and particularity."), *with Nautilus*, 134 S. Ct. at 2124 ("[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."); *see also* RB55-58.[1]

## B.    The Panel's Opinion

Instead of reviewing the district court's subsidiary factual findings for clear error, the Panel dismissed them as "immaterial" because it asserted it only needed the intrinsic record to construe the disputed term. Panel Op. 9. The Panel found a skilled artisan would understand the third contact hole meant two different holes, even though "someone unknowledgeable in the field of LCD manufacturing" might understand the third contact hole to be a single hole. *Id.* at 9-10.

The Panel, though, did not ignore all of the extrinsic evidence in reaching this decision because it used extrinsic evidence it found useful. It found Eidos's construction "reflects how a person of ordinary skill in the art at the time of the invention would have understood the limitation after reading the intrinsic record" (*id.*), but the only evidence of this "fact" was the opinion of Eidos's expert, whose

---

[1] The Panel noted the district court did not have the benefit of the Supreme Court decision in *Nautilus* (Panel Op. 9 n.3), but did not suggest this made a difference.

testimony the district court rejected. A33-34. The Panel also fashioned a hypothetical about "an electric car for the United States and United Kingdom" (Panel Op. 10), which the district court never considered.[2] The Panel's speculation was a finding of fact (*Teva*, 135 S. Ct. at 841) that rejected the district court's finding. A32-34.

When the Panel relied on Embodiment D to hold that the specification makes clear "the limitation-at-issue requires formation of separate contact holes" (Panel Op. 12-15), it criticized the district court for dismissing those teachings. *Id.* at 14-15. But the district court did so because it rejected the opinion of Eidos's expert that one of skill in the art would understand the D embodiment to support such construction. A29-30,32-33. Defendants' experts, on the other hand, opined the D embodiment showed a different structure and approach from the claimed invention. *See* RB8-9;RB46-52;A32. They also denied a skilled artisan would turn to the D embodiment to understand claim 1. *See* A32;RB48-51. The district court credited these opinions in rejecting Eidos's reliance upon the D embodiment to support Eidos's first proposed construction. A32-33. Although the Panel held the district court's findings "immaterial," it actually rejected the district court's

---

[2] Scholars criticized the hypothetical as "a feat of interpretive gymnastics." Jason Rantanen, *Teva, Nautilus, and Change Without Change*, at 13 n.72 (March 26, 2015), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2585844.

assessment of the conflicting expert opinions without finding that assessment clearly erroneous. The Panel selectively cited Embodiment D, as Eidos's expert did,[3] and ignored Embodiment S, which described a common hole for connecting gate and source wiring. *See* Panel Op. 12-15; RB9-10,19.

The Panel also faulted the district court for failing to "explain how the noted differences in the structures of the [D and G] embodiments impact the structure of the limitation-at-issue or impact how a person of ordinary skill in the art would have understood the limitation." Panel Op. 14. The district court, though, considered opinions of the three Defendants' experts who explained how none of the embodiments supported Eidos's first proposed construction. The District Court found that "the interpretation sought by Eidos' [sic] expert does not conform to the specification," and "the expert reports merely highlight the ambiguity in the term at issue." A33. In dismissing the district court's findings as immaterial, the Panel just replaced those findings with its own, which is precisely what *Teva* forbade. *Teva*, 135 S. Ct. at 843.

---

[3] Although Embodiment D may describe separate holes, it does not mean original claim 5, which corresponded to Embodiment D, required separate contact holes as the Panel found. *Compare* Panel Op. 12, *with* Argument at 20:32-21:48, *Eidos Display, LLC v. AU Optronics Corp.*, No. 2014-1254, available at http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2014-1254.mp3. Moreover, the Defendants have always disputed that the D embodiment provided support for changing the meaning of "a contact hole for source wiring and gate wiring connection terminals" from one contact hole to two contact holes.

## IV.   ARGUMENT FOR REHEARING EN BANC

### A.   In Affording No Deference to the District Court, the Panel, Found Facts De Novo, in Contravention of *Teva*

In *Teva*, the Supreme Court, held that this Court "must apply a 'clear error,'

not a *de novo*, standard of review" for a district court's fact findings subsidiary to a

decision on claim construction. *Teva*, 135 S. Ct. at 835. *Teva* recognized this Court

could review certain claim construction issues *de novo*:

> [A] district court's construction of a patent claim, like a district
> court's interpretation of a written instrument, often requires the judge
> only to examine and to construe the document's words without
> requiring the judge to resolve any underlying factual disputes.

*Id.* at 840-841.

In this case, though, the district court did resolve an underlying factual

dispute, which brings it out of the *Teva* exception permitting *de novo* review. The

lower court found the claim ambiguous based in part on the opinions of experts.

Although such a determination "may be close to dispositive of the ultimate legal

question of the proper meaning of the term in the context of the patent," "'[a]n

issue does not lose its factual character merely because its resolution is dispositive

of the ultimate' legal question." *Id.* at 841-42 (citing *Miller* v. *Fenton*, 474 U. S.

104, 113 (1985)). "[T]o overturn the judge's resolution of an underlying factual

dispute, the Court of Appeals must find that the judge, in respect to those factual

findings, has made a clear error." *Id.* at 841. The Panel made no such finding.

Instead, it held:

> We reverse the district court's finding of indefiniteness because Eidos'[sic] proposed construction for the disputed limitation reflects how a person of ordinary skill in the art at the time of the invention would have understood the limitation after reading the intrinsic record.

Panel Op. 9-10. It began its analysis as follows:

> Experts for both parties agree that, at the time of the '958 patent, the only industry practice for this manufacturing process was to create individual holes, referred to as "contact holes," through the passivation film to each connection terminal.

Panel Op. 4-5. This refers to extrinsic evidence. Even if the Panel were correct, the mere fact that its interpretation reflected industry practice does not suggest how skilled artisans would interpret the claim language in light of the intrinsic evidence. The claims should define an advance over the state of the art, not describe the state of the art, so a skilled artisan would have no reason to read the claims as only reflecting the current state of the art, especially when the examiner found the G8 limitation-at-issue the only novel aspect of the claim. *See* RB10.

The Panel decision adopted the opinions of Eidos's expert by deciding "the meaning of the claim at issue is clear in view of the intrinsic record and undisputed facts." Panel Op. 9. But the Panel acknowledged the claim language supported a reading that the claimed method could require three rather than four holes, which is an admission the intrinsic evidence has some ambiguity. *Id.* at 10. Although the

Panel noted, "If the patentee wanted to deviate from the standard practice and claim a novel shared contact hole, some teaching of how to depart from the common practice would not only be expected, but is required" (*id.* at 11), the patent had such teaching in Embodiment S (RB9-10), and the Panel ignored it. Panel Op. 11. The Panel also ignored the Reexamination Examiner's explanation that he found the claim ambiguous, but was unable to address Section 112 issues during reexamination, so he adopted the four-hole theory. RB10-12. The Panel also ignored an embodiment in the patent that showed a single contact hole for the two wiring terminals in the disputed term. RB9-10.

The Panel's entire ruling rests on a finding that "the state of the art for manufacturing LCD panels always had been to form contact holes for source wiring connection terminals that are separate from contact holes for gate wiring connection terminals." Panel Op. 11. That is another factual finding.

Defendants' experts opined that skilled artisans would not understand claim 1 to be referring to this allegedly standard practice. RB18. In finding to the contrary, the Panel not only made a finding of fact, it credited one piece of extrinsic evidence over other ones without finding the district court court's contrary finding clear erroneous.

## B.    The Panel's Decision Will Cause Significant Harm

The Panel's decision allows this Court to ignore *Teva* by declaring an intrinsic record clear and rendering any district court's findings immaterial. Scholars have already pointed to the Panel's decision as "a vivid example of this mechanism in operation." Jason Rantanen, *Teva, Nautilus, and Change Without Change*, at 21. Mr. Rantanen observed, "[T]he Federal Circuit avoids confronting the deferential standard of review by concluding that '[t]o the extent the district court considered extrinsic evidence in its claim construction order or summary judgment order, that evidence is ultimately immaterial to the outcome because the intrinsic record is clear.'" *Id.* (second alteration in original). "[T]he court draws heavily not just on how the patent document itself shapes how a person of ordinary skill in the art would perceive the term 'a contact hole,' but on how industry knowledge would also shape that meaning." *Id.*

The Supreme Court anchored its decision on Federal Rule of Civil Procedure 52, precedent, and practical considerations, and held *de novo* review of factual findings "would tend to undermine the legitimacy of the district courts . . ., multiply appeals . . ., and needlessly reallocate judicial authority." *Teva*, 135 S. Ct. at 836-837 (alterations in original) (citations omitted). The Panel's decision instead fosters that result.

## V.    CONCLUSION

Defendants respectfully submit that the *en banc* Court reconsider the Panel's decision in this case.

Dated: April 9, 2015                    Respectfully submitted,


/s/ *E. Robert Yoches*
E. Robert Yoches
Finnegan, Henderson, Farabow,
  Garrett & Dunner, L.L.P.
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

Ming-Tao Yang
Finnegan, Henderson, Farabow,
  Garrett & Dunner, L.L.P.
3300 Hillview Avenue
Palo Alto, CA 99304-1203
(650) 849-6600

*Attorneys for Defendants-Appellees Chi Mei Innolux Corporation, Chi Mei Optoelectronics USA Inc., HannStar Display Corporation, and Hannspree North America, Inc.*


/s/ *Christopher R. Benson*
Eric Hall
Daniel Leventhal
Norton Rose Fulbright US LLP
1301 Mckinney, Suite 5100
Houston, TX  77010
(713) 651-5151

Christopher R. Benson
2705 Pearce Road
Austin, TX  78730
(832) 567-0700

*Attorneys for Defendant-*
*Appellee Chunghwa Picture*
*Tubes, Ltd.*

# ADDENDUM

# United States Court of Appeals for the Federal Circuit

———————————

**EIDOS DISPLAY, LLC, EIDOS III, LLC,**
*Plaintiffs-Appellants*

**v.**

**AU OPTRONICS CORPORATION, AU OPTRONICS CORPORATION AMERICA, CHI MEI INNOLUX CORPORATION, CHI MEI OPTOELECTRONICS USA INC., CHUNGHWA PICTURE TUBES, LTD., HANNSTAR DISPLAY CORPORATION, HANNSPREE NORTH AMERICA, INC.,**
*Defendants-Appellees*

———————————

2014-1254

———————————

Appeal from the United States District Court for the Eastern District of Texas in No. 6:11-cv-00201-LED-JDL, Chief Judge Leonard Davis.

———————————

Decided: March 10, 2015

———————————

Robert Tyler Goodwyn, McKenna Long & Aldridge LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by Gaspare Joseph Bono, Cass Walker Christenson, Robert C. Nissen.

Christopher Benson, Austin, TX, argued for defendants-appellees. Defendant-appellee Chunghwa Picture

Tubes, Ltd., also represented by DANIEL LEVENTHAL, PAUL ANDREW DYSON, ERIC B. HALL, Norton Rose Fulbright, Houston, TX. Defendants-appellees AU Optronics Corporation, AU Optronics Corporation America, also represented by MARVIN CRAIG TYLER, BRIAN A. DIETZEL, GEOFFREY WILLIAM HEAVEN, Wilson, Sonsini, Goodrich & Rosati, PC, Austin, TX. Defendants-appellees Chi Mei Innolux Corporation, Chi Mei Optoelectrics, USA Inc., Hannspree North America, Inc., Hannstar Display Corporation, also represented by MING-TAO YANG, JACOB ADAM SCHROEDER, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Palo Alto; EDWARD ROBERT YOCHES, Washington, DC.

————————————————

Before WALLACH, TARANTO, and CHEN, *Circuit Judges*.

CHEN, *Circuit Judge*.

Plaintiff-Appellants Eidos Display, LLC and Eidos III, LLC (Eidos) appeal from the district court's grant of a motion for summary judgment, finding the asserted claim of U.S. Patent No. 5,879,958 (the '958 patent) to be invalid as indefinite. Because the claim, when read in light of the specification and prosecution history, informed with reasonable certainty those skilled in the art at the time the patent was filed about the scope of the claimed invention, we *reverse* the district court's grant of summary judgment of indefiniteness, and *remand* to the district court for further proceedings consistent with our decision.

## BACKGROUND

Eidos alleges AU Optronics Corporation, AU Optronics Corporation America, Chi Mei Innolux Corporation, Chi Mei Optoelectronics USA Inc., Chunghwa Picture Tubes, Ltd., Hannstar Display Corporation, and Hannspree North America, Inc. (collectively, "Display Manufacturers") infringe claim 1 of the '958 patent. The '958 patent is directed toward manufacturing processes

for an electro-optical device, such as a liquid crystal display (LCD).

The specification of the '958 patent contains 17 embodiments, each identified by a letter (A through H, J, and L through S). Each embodiment describes a manufacturing process that reduces the number of photolithographic steps in creating an LCD panel compared to prior art processes, lowering the production cost and improving yield and production efficiency. '958 patent, 1:19–3:37 (describing the prior art as containing seven photolithographic steps), 4:39–14:18 (describing the invention as containing four or five photolithographic steps), 14:31–37 (comparing the invention to the prior art). Each embodiment is broken down into a series of "forming" steps that deposit material, such as metal, insulator, or passivation material, on the substrate or previous layers, as well as a series of "photolithographic" steps that etch or remove portions of previously-formed material. For example, the seventh embodiment, identified by the letter "G," contains five forming steps—G1, G3, G5, G7, and G9—sequentially interspersed with five photolithographic steps—G2, G4, G6, G8, and G10. *Id.* at 8:33–67. The specification describes the manufacturing process for each disclosed embodiment with reference to the figures. For example, figures 54 through 63 depict the process steps of the G embodiment. *Id.* at 18:9–44, 35:31–36:65.

The circuitry in the LCD devices formed by the patented manufacturing processes is the same as circuitry formed by a prior art manufacturing process. *Id.* at 1:16–18. An example of such a prior art circuit is found in figure 169, reproduced below. *Id.*[1] Figure 169 shows a matrix with source wiring (S1, S2, S3, . . . Sn) forming the vertical lines and gate wiring (G1, G2, G3, . . . Gn) form-

---

[1]    Line 16 of column 1 erroneously refers to "FIG. 169" as "FIG. 165."

ing the horizontal lines. *Id.* at 1:19–23. The source wiring is connected to a signal supply circuit to provide image data, and the gate wiring is connected to a scanning circuit to provide control signals. *Id.*; Appellants' Br. at 6–7.



FIG. 169
PRIOR ART

Important to this appeal, the electrical connection between a source wire and the signal supply circuit is called a *source wiring connection terminal*. The electrical connection between a gate wire and the scanning circuit is called a *gate wiring connection terminal*. In an LCD panel, there are many individual source and gate wires, each with a connection terminal located at the end of the wire. Appellants' Br. at 7 (citing *Eidos Display, LLC v. AU Optronics Corp.*, No. 6:11-cv-201 LED-JDL, 2013 WL 1559729, at *5 (E.D. Tex. Apr. 12, 2013)). During the relevant LCD manufacturing process, a non-conductive passivation film is formed on top of the wiring and connection terminals. *See* '958 patent, 58:34–36 (Step G7). The passivation film is then etched away to allow the scanning and signal supply circuits to connect to the terminals. *See id.* at 58:37–41 (Step G8). Experts for

both parties agree that, at the time of the '958 patent, the only industry practice for this manufacturing process was to create individual holes, referred to as "contact holes," through the passivation film to each connection terminal. While a single contact hole shared by all the connection terminals may have been technically possible, no expert was aware of any example or teaching where such a contact hole was ever created, and neither party put any such teaching into the record, if such a teaching exists.

The asserted claim 1 is the only issued claim in the '958 patent and recites:

1. A method for producing an electro-optical device in which an electro-optical material is put between a pair of substrates opposed to each other, at least a portion of opposing surfaces of the substrates is insulative, a plurality of source wirings and a plurality of gate wirings are formed crossing each other on the surface of one of said pair of substrates and a transparent pixel electrode and a thin film transistor are formed at each of the crossing points between the source wirings and the gate wirings, wherein the method comprises:

a step G1 of forming a first metal film on the surface of said one substrate,

a first photolithographic step G2 of patterning the first metal film to form a gate electrode and a gate wiring,

a step G3 of forming a first insulator film, a semiconductor film and an ohmic contact film on the surface of said one substrate after the first photolithographic step,

a second photolithographic step G4 of patterning the semiconductor active film and the ohmic contact film to form a semiconductor portion above

the gate electrode in a state isolated from other portions,

a step G5 of forming a second metal film on the surface of said one substrate after the second photolithographic step,

a third photolithographic step G6 of patterning the second metal film and the ohmic contact film to form a source electrode, a drain electrode and a channel portion,

a step G7 of forming a passivation film on the surface of said one substrate after the third photolithographic step, and

a fourth photolithographic step G8 of patterning the passivation film to form a contact hole reaching the gate wiring, a contact hole reaching the drain electrode and *a contact hole for source wiring and gate wiring connection terminals*,

a step G9 of forming a transparent conductive film on the surface of said one substrate after the fourth photolithographic step, and

a fifth photolithographic step G10 of patterning the transparent conductive film to form a transparent pixel electrode.

*Id.* at 58:5–47 (emphasis added to highlight the limitation at issue on appeal).

During *Markman* proceedings in front of the magistrate judge, the primary claim construction dispute focused on the last portion of step G8, "a contact hole for source wiring and gate wiring connection terminals." *Eidos Display*, 2013 WL 1559729, at *4. Eidos argued that the disputed limitation requires separate and distinct contact holes for the source wiring connection terminals and gate wiring connection terminals, consistent with the standard industry practice and the specification,

whereas Display Manufacturers argued that the plain language of the disputed limitation requires a shared contact hole for all connection terminals. *Id.* The magistrate judge reviewed the claim language, specification, and the record in the then-ongoing *ex parte* reexamination, and determined that the dispute "[wa]s not ripe for claim construction, as the dispute [as] presented center[ed] around theories of invalidity pursuant to 35 U.S.C. § 112." *Id.* at *6.

Defendants Chi Mei Innolux Corporation and Chi Mei Optoelectronics USA Inc. (collectively, "Innolux") then filed a motion for summary judgment alleging noninfringement, in which they argued for a third construction of the disputed limitation, that two different structures be formed: 1) a contact hole for source wiring and 2) the gate wiring connection terminals, with no corresponding contact hole or holes. The district court declined to adopt Innolux's proposed construction, and instead ordered briefing as to whether the disputed limitation was definite. Display Manufacturers subsequently filed a motion for summary judgment asserting indefiniteness. Eidos, in its response to Display Manufacturers' motion, proposed a fourth construction of the disputed limitation: that the structure for the limitation could be formed as either a single contact hole as Display Manufactures proposed, or as separate contact holes as Eidos originally proposed. Joint Appendix (J.A.) 33.

The magistrate judge rejected all four proposed constructions of the disputed limitation. Regarding the first, second, and fourth proposed constructions, the magistrate judge determined that the specification failed to support that "a contact hole for source wiring and gate wiring connection terminals" could be formed as either separate contact holes or a shared contact hole. The magistrate judge dismissed Innolux's proposed construction because it required connection terminals to be formed from an insulating material, whereas the specification requires

the terminals to be made of a conductive material. The magistrate judge recommended that the district court grant the motion for summary judgment on indefiniteness because "the Court is unable to arrive at a construction that would allow a person of ordinary skill in the art to determine what is claimed when the claim is read in light of the specification." J.A. 34 (citation omitted). The district court issued an order adopting the magistrate judge's recommendation and granting the motion for summary judgment of indefiniteness. J.A. 22.

Eidos appealed and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112, ¶ 2 (2006).[2] Keeping in mind that "patents are not addressed to lawyers, or even to the public generally, but rather to those skilled in the relevant art," the patent claims "must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) (internal quotation marks omitted). A claim fails to satisfy this statutory requirement and is thus invalid for indefiniteness if its language, when read in light of the specification and prosecution history, "fail[s] to inform, with reasonable

---

[2]    Paragraph 2 of 35 U.S.C. § 112 was replaced with newly designated § 112(b) when § 4(c) of the America Invents Act (AIA), Pub. L. No. 112-29, took effect on September 16, 2012. Because the applications resulting in the patents at issue in this case were filed before that date, we will refer to the pre-AIA version of § 112.

certainty, those skilled in the art [at the time the patent was filed] about the scope of the invention." *Id.* at 2124.[3]

We review the grant of summary judgment of indefiniteness *de novo*, applying the same standard used by the district court. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). We review the district court's ultimate indefiniteness determination *de novo*. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014). The indefiniteness inquiry here is intertwined with claim construction, *see Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999), which, because the meaning of the claim at issue is clear in view of the intrinsic record and undisputed facts, we also review *de novo*, *see Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840–42 (2015). To the extent the district court considered extrinsic evidence in its claim construction order or summary judgment order, that evidence is ultimately immaterial to the outcome because the intrinsic record is clear. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc) ("[A] court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." (internal quotation marks omitted)). We reverse the district court's finding of indefiniteness because Eidos' proposed construction for the

---

[3]   The district court granted summary judgment on January 22, 2014, without the benefit of the Supreme Court's guidance in *Nautilus*. The magistrate judge recommended that summary judgment of indefiniteness be granted because he determined, under the pre-*Nautilus* standard, that the asserted claim was "insolubly ambiguous." J.A. 34 (citing *Honeywell Int'l v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338–39 (Fed. Cir. 2003)).

disputed limitation reflects how a person of ordinary skill in the art at the time of the invention would have understood the limitation after reading the intrinsic record. *See id.* at 1312–18.

The limitation-at-issue, "a contact hole for source wiring and gate wiring connection terminals," by itself, might suggest to someone unknowledgeable in the field of LCD manufacturing that one contact hole is formed for all the source wiring connection terminals and gate wiring connection terminals, as the Display Manufacturers argue. But the limitation, by itself, might also indicate that many contact holes are formed for the connection terminals. To analogize, a person familiar with cars, when reading the sentence "I am going to create an electric car for the United States and United Kingdom," would likely expect different electric cars to be created, one set with the steering wheel located on the left for driving in the United States, and another set with the steering wheel on the right for driving in the United Kingdom. The intrinsic record here makes sufficiently clear that a person of ordinary skill in the art—someone with knowledge of LCD manufacturing—after considering the limitation "in the context of the particular claim in which the disputed term appears, [and] in the context of the entire patent, including the specification," *Phillips*, 415 F.3d at 1313, would understand the limitation-at-issue to call for separate, different contact holes for the source wiring connection terminals and gate wiring connection terminals, rather than one shared contact hole.[4]

---

[4] During reexamination of the '958 patent, the examiner concluded that the limitation-at-issue "implicitly requires separate contact holes for the source wiring and gate wiring connection terminals." J.A. 6079–80.

As an initial matter, no party disputes that the state of the art for manufacturing LCD panels always had been to form contact holes for source wiring connection terminals that are separate from contact holes for gate wiring connection terminals. Consistent with that well-established practice, the specification teaches that each connection terminal for the electro-optical device would receive its own contact hole, for two reasons.

First, nothing in the 172 figures or 58 columns of the '958 patent describes how a person of ordinary skill in the art would deviate from the known industry practice to create a novel shared contact hole for all the connection terminals. If the patentee wanted to deviate from the standard practice and claim a novel shared contact hole, some teaching of how to depart from the common practice would not only be expected, but is required. *See* 35 U.S.C. § 112 ("The specification shall contain a written description of the invention, and the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same . . . .").

Second, the only description corresponding to "a contact hole for source wiring and gate wiring connection terminals" in the specification teaches that separate contact holes are formed for the different connection terminals. This teaching is evident when considering the history of the '958 patent, in particular the patent application to which the '958 patent claims priority, application number 08/459,925. *See Masco Corp. v. United States*, 303 F.3d 1316, 1324 (Fed. Cir. 2002) ("The prosecution history of a parent application may be considered in construing claim terms." (citing *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim

limitation."))).  The '925 application originally contained seventeen independent claims, J.A. 9419–49, which were subject to a seventeen-species restriction, J.A. 9516.  The specification in the '925 application, which is substantially the same as the specification in the '958 patent, contains seventeen embodiments that match with and describe the seventeen original independent claims.  The limitation-at-issue, "a contact hole for source wiring and gate wiring connection terminals," appeared in five of the original claims; claim 3 (embodiment B), claim 4 (embodiment C), claim 5 (embodiment D), claim 7 (embodiment F), and claim 8 (embodiment G).  Original claim 8 ultimately became claim 1 of the patent before us—the '958 patent.  Although the portion of the specification describing embodiment G does not explain in detail this particular photolithographic step, the portion describing embodiment D, which claims this step using identical claim language, explicitly describes this photolithographic step as forming "a contact hole [] for a source wiring connection terminal and a contact hole for a gate wiring connection terminal."  '958 patent, 31:42–53.  Both parties agree that, as recited in original claim 5 (which corresponds to embodiment D), "a contact hole for source wiring and gate wiring connection terminals" requires *separate* contact holes for each connection terminal, consistent with Eidos' proposed construction.  *Id.* at 31:50–53.  After reviewing the specification as well as the claims originally filed with the Patent Office, we see no reason to ascribe a different meaning to the same limitation in original claim 8, *i.e.*, claim 1 of the '958 patent.  *See Phillips*, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.").

Even without considering the priority application, the specification makes clear that the limitation-at-issue requires formation of separate contact holes.  Again, with

respect to embodiment D, the specification, at one point, describes "a fourth photolithographic step D8 of patterning the passivation film to remove a portion of the passivation film, . . . forming *a contact hole for source wiring and gate wiring connection terminals*." '958 patent, 7:11–22 (emphasis added).  And, as already stated, the specification later clarifies that "photolithographic step D8" entails forming "a contact hole [] for a source wiring connection terminal and a contact hole for a gate wiring connection terminal." *Id.* at 31:42–53.  The specification thus *equates* the limitation-at-issue with forming separate contact holes for the source wiring connection terminal and the gate wiring connection terminal.  Nothing in the specification suggests why the identical phrase recited in the claimed "fourth photolithographic step G8" should be read differently from the described "fourth photolithographic step D8."  Instead, a person of ordinary skill in the art would understand that the phrase, "a contact hole for source wiring and gate wiring connection terminals," when used repeatedly throughout the patent, would be given a consistent meaning.  *See Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1349–50 (Fed. Cir. 2012) (using the description of a word in the specification for a different structure to inform the meaning of the same word in the claim because "claim terms are normally used consistently throughout the patent" (quoting *Phillips*, 415 F.3d at 1314)).

The limitation-at-issue also appears in original claims 3, 4, and 7 of the '925 application, J.A. 9421–25, 9429–30, and in the corresponding embodiments B, C, and F of the specification, '958 patent, 5:38–6:8, 6:9–49, 7:64–8:32. Display Manufacturers argue that the lack of description for the limitation-at-issue in embodiments B, C, F, and G, as described in the specification, is evidence that the structure in those embodiments is different than in embodiment D.  We disagree.  As set forth above, the relationship between the specification description for

embodiment D and original claim 5 establishes the proper understanding for the same claim limitation recited in the other original claims of the '925 application, *i.e.*, claim 3 (embodiment B), claim 4 (embodiment C), claim 7 (embodiment F), and claim 8 (embodiment G).

The district court dismissed the teachings of the D embodiment because structures formed in Step D8, as recited in original claim 5 of the '925 application and in the specification, do not precisely mirror the structures formed in the claimed Step G8. J.A. 29. The magistrate judge noted that, in addition to the "contact hole for source wiring and gate wiring connection terminals," Step G8 forms a contact hole reaching the gate wiring and a contact hole reaching the drain electrode, whereas, in the D embodiment, the contact hole reaching the gate wiring is formed during Step D4, and a contact hole reaching the drain electrode is not mentioned. J.A. 29–30. Relatedly, Display Manufacturers argue that the different embodiments have a different number of steps and have a different sequence in which the patterns are etched, which they argue results in "a fundamentally different approach to manufacturing a [device]." Appellees' Br. at 8–9. Different embodiments, however, are expected to have differences, and neither the magistrate judge nor Display Manufacturers explain how the noted differences in the structures of the embodiments impact the structure of the limitation-at-issue or impact how a person of ordinary skill in the art would have understood the limitation. Instead, the embodiments all similarly describe manufacturing processes for an electro-optical device using a reduced number of photolithographic steps over the prior art, and the structure for the limitation-at-issue is formed in the same context in each embodiment—in a "photolithographic step [] of patterning the passivation film." '958 patent, 6:4–5, 6:43–44, 7:11–12, 8:23–24, 8:57–58. This similar context of the limitation-at-issue, in similar embodiments, supports the conclusion that a person of

ordinary skill in the art would adopt the same understanding for the same limitation recited in claim 1 of the '958 patent.

Finally, Display Manufacturers argue that permitting separate contact holes to be covered by the limitation "a contact hole for source wiring and gate wiring connection terminals" would require rewriting the limitation, which is impermissible except in certain situations. Appellees' Br. at 29 (citing *Source Vagabond Sys., Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014)). Determining how a person of ordinary skill in the art would understand the limitation, however, is different from rewriting the limitation. Here, because a person of ordinary skill in the art would understand that the limitation "a contact hole for source wiring and gate wiring connection terminals" means separate contact holes for source wiring connection terminals and gate wiring connection terminals, adopting such a construction is not rewriting the claim limitation.

* * *

The '958 patent teaches a person of ordinary skill in the art that "a contact hole for source wiring and gate wiring connection terminals" is formed by etching separate contact holes for the source wiring connection terminals and for the gate wiring connection terminals, as described in the specification and prosecution history. Therefore, the limitation "a contact hole for source wiring and gate wiring connection terminals" in claim 1 of the '958 patent is not indefinite under 35 U.S.C. § 112, ¶ 2. We reverse the judgment of indefiniteness and remand to the district court for further proceedings consistent with this opinion.

## REVERSED AND REMANDED

### Costs

Each party shall bear its own costs.

# CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing **PETITION FOR REHEARING EN BANC OF CHI MEI INNOLUX CORPORATION, CHI MEI OPTOELECTRONICS USA INC. , CHUNGHWA PICTURE TUBES, LTD., HANNSTAR DISPLAY CORPORATION, HANNSPREE NORTH AMERICA, INC.** was served upon registered counsel by operation of the Court's CM/ECF system on this 9th day of April, 2015.

/s/ Kay Wylie
Kay Wylie